IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ALLSTATE INSURANCE COMPANY, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | Civil Action No. 4:19-cv-01989 |
| v. | § | |
| | § | **JURY TRIAL DEMANDED** |
| CORINTH CONCEPTS LLC, | § | |
| | § | |
| *Defendant*. | § | |
| | § | |

## VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Allstate Insurance Company ("Allstate") alleges as follows for its Verified Complaint for Injunctive and Other Relief against Corinth Concepts LLC ("Corinth" or "Defendant"):

## NATURE OF THE ACTION

1.      This action is the result of the improper and illegal conduct of Corinth, an entity formed by an Allstate Exclusive Agent ("EA") and three other individuals, and whose sole purpose was to manipulate Allstate's generous commission program.  In essence, Corinth facilitated and coordinated the formation of Allstate Exclusive Agencies that were effectively "fronts" for Corinth; and Corinth had complete control over, and reaped all of the financial benefits from, the Agencies.

2.      Specifically, Corinth recruited individuals, often with no prior insurance experience, to set up new Allstate Exclusive Agencies on its behalf and without disclosing Corinth's interest to Allstate.  Once the individual was approved by Allstate and became an EA, Corinth would then have the EA execute an operating agreement under which the EA would become a Corinth employee and would assign all commissions to Corinth in exchange for a

salary.  Oftentimes, Corinth would provide the required capital investment for the agency and then take control of the agency by purchasing equipment for the agency, seizing EA bank accounts and controlling payments out of the accounts, and signing the lease for the agency location.

3.     The purpose of this scheme was to take advantage of Allstate's Enhanced Compensation Program, under which new agencies, like the Corinth-controlled agencies, earn higher commission rates during their first several years in business so as to allow for a ramp-up period and to encourage initial sales growth and agency stability.

4.     As such, once the Corinth-controlled Allstate Exclusive Agencies were up and running, the Agencies were staffed almost exclusively by employees of Corinth, who Corinth hired, trained, paid, and supervised.  These employees were housed in a central hub and assigned by Corinth to work on behalf of multiple Corinth-controlled agencies simultaneously so as to maximize commissions.  The individual agencies did virtually none of their own hiring or supervision of their own employees.

5.     As a result of its control over these Allstate Exclusive Agencies, and without Allstate's knowledge or authorization, Corinth was provided access to and use of confidential Allstate customer contact information.  This confidential information is vital to Allstate's success and highly guarded by Allstate because Allstate receives an economic advantage from the information not being available to a competitor or the public.  Consequently, this information is considered a "trade secret" under the law, and Corinth has no right to access, possess, or use Allstate's trade secrets.

6.     In addition, following an investigation of the foregoing, Allstate terminated its affiliation with all of the Corinth-controlled EAs on May 28, 2019.  As a result, Corinth has no

reason (to the extent it ever did) for continuing to possess Allstate's trade secrets since its fraudulent and hidden ties to Allstate have been severed through Allstate's termination of Allstate's affiliation with the Corinth-controlled EAs.  Put another way, Corinth should not have had access to Allstate's trade secrets to begin with, and it certainly should not have access to Allstate's trade secrets now.  Yet, by Corinth continuing to possess and potentially use and/or disclose Allstate's trade secrets, Allstate is at serious risk of irreparable harm.

7.     Accordingly, and in addition to recovering for the damages Corinth has caused to Allstate, Allstate seeks immediate injunctive relief that requires Corinth to (a) return any and all Allstate information and property in its possession, custody, or control to Allstate, (b) not access, use and/or possess any Allstate information and property, and (c) provide Allstate access to Corinth's electronic devices and computer systems for purposes of review and remediation of Allstate information and property.

8.     Naturally then, Allstate asserts claims for damages and injunctive relief under the Defend Trade Secrets Act, 18 U.S.C. § 1833, *et seq.* ("DTSA"), and the Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code Ann. §§ 134A.001, *et seq.* ("TUTSA"), as well as for tortious interference with contract, unjust enrichment, and replevin.

## THE PARTIES

9.     Plaintiff Allstate Insurance Company ("Allstate") is an Illinois corporation with its principal place of business located in Northbrook, Illinois.

10.     Upon information and belief, Defendant Corinth is a Texas limited liability company with its principal place of business at 19 Thornhedge Court, The Woodlands, Texas. Corinth was formed by Brian McVeigh, Allen Rosenbaum, Melanie Rosenbaum, and Charles Burchard.  Mr. Burchard was an Allstate Exclusive Agent in Conroe, Texas, beginning in 2011. Mr. Rosenbaum was employed by several Allstate Exclusive Agencies as an Allstate Licensed

3

Service Provider.  Based upon information and belief, all four individuals are citizens of the State of Texas.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this dispute, pursuant to 28 U.S.C. § 1331, because Allstate's claim against Corinth under the DTSA, 18 U.S.C. § 1833, *et seq.*, raises a Federal question.  Allstate's remaining claims fall within the Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, because the claims are so related to the Federal question that they form part of the same case or controversy.  Alternatively, this Court has diversity jurisdiction, pursuant to 28 U.S.C. § 1332(a), because this action and controversy is between citizens of different states and exceeds the value of $75,000, exclusive of interest and costs.

12.     This Court has personal jurisdiction over Corinth because it is a resident of Texas. Venue is proper in the United States District Court for the Southern District of Texas, pursuant to 28 U.S.C. § 1391(b), because Corinth's primary place of business is in this District, the Allstate property Allstate seeks to be returned is located in this District, and a substantial part of the events giving rise to Allstate's claims occurred in this District.

## BACKGROUND

### Allstate's Business and Hiring of Independent Exclusive Agents

13.     Allstate is one of the nation's leading providers of insurance products and services to individuals and businesses.  Among other things, Allstate provides automobile insurance and property and casualty insurance to individuals and businesses.

14.     In addition to providing these products and services (collectively "products") directly, Allstate appoints independent exclusive agents ("EAs"), through its Exclusive Agency Program, to sell Allstate products.

15.     Allstate rigorously screens its EAs in order to ensure that the EAs are qualified to represent and sell Allstate products, have the proper tools and facilities to analyze and meet customer needs, and can furnish customers with appropriate solutions.

16.     Allstate EAs are also authorized to employ "Licensed Sales Professionals" ("LSPs") to assist the Exclusive Agents in performing services under the Allstate Agreements.

17.     EAs and LSPs are provided training by Allstate once they become EAs and/or LSPs.  In that process, they are provided confidential information regarding the products offered by Allstate and business strategies to assist with developing business.  They are also provided highly proprietary and confidential information about Allstate's business model in order to assist them in their role as EAs and LSPs.  This includes confidential information that the EA and/or LSP would not have access to prior to becoming an EA or LSP.

18.     Allstate expends substantial resources advertising, marketing, and promoting its products.  The EAs and their LSPs benefit directly and indirectly from Allstate's advertising, marketing, and promotional efforts, as well as from Allstate's goodwill, reputation, and name recognition.  These efforts and expenditures allow the EAs and their LSPs to develop and cultivate accounts and relationships on behalf of Allstate.

19.     Accordingly, Allstate relies heavily upon repeat business and renewal of policies to maintain its competitive advantage.  Maintaining goodwill and a solid business reputation with its customers is a critical component of Allstate's success.  Indeed, because Allstate's business is a service business, the relationship that each EA and its LSPs have with Allstate customers is highly dependent on the attention and excellent service given to the customer on an ongoing basis, and the continued trust the customers place in Allstate as a leading provider of such services.

**Protection of Allstate Confidential Information**

20.     Allstate and its customers entrust Allstate EAs and their LSPs to safeguard and protect their private information, which includes information relating to, among other things, their personal data, date of birth, types of policies, amount of insurance, premium amounts, renewal dates of policies, description and location of assets and property, claims histories, insurance needs, pricing information, and other insurance coverage information, from unauthorized use or disclosure.  Access to confidential information regarding Allstate customers is provided to or gained by all EAs and LSPs for Allstate.  No EAs or LSPs are provided with access to confidential information about Allstate customers before entering into their relationships with Allstate.

21.     Allstate protects the information described above, by, among other things: limiting the disclosure and use of this information to only the EA (LSPs and other EA employees are expressly denied access to such information unless they sign a Confidentiality and Non-Competition Agreement with Allstate); educating the EA and his or her LSPs about the requirement and necessity of keeping this information confidential; restricting access to this information by restricting access to computer networks and requiring the use of passwords to access the information; and, as discussed above, requiring the EA and his or her LSPs to execute a written agreement that protects against the misuse and improper disclosure of Allstate confidential information.

22.     Consequently, all EAs and their LSPS, pursuant to their Allstate Agreements, and while performing services under their Allstate Agreements, acknowledge that they will have access to Allstate confidential information; promise not to disclose Allstate confidential information to anyone not authorized to receive it (including the EAs' own employees); and

confirm that they will not use Allstate confidential information for their own benefit or for any improper purpose.

23.     EAs and their LSPs agree, upon termination of their relationship with Allstate, to continue treating Allstate confidential information as confidential, to not disclose, either directly or indirectly, Allstate confidential information to any third party, and to immediately return all Allstate confidential information to Allstate.

24.     Hence, the information described above is not available to the general public and is closely guarded by Allstate.  Allstate keeps such information strictly confidential in order to protect its customers' privacy and to maintain a competitive advantage in the highly competitive insurance business.  The time, expense, and effort that go into the development of Allstate confidential and proprietary information are such that the independent development of identical or comparable materials by Allstate competitors would be extraordinarily difficult and expensive.

### The Corinth Controlled EAs Enter into EA Agreements to Solicit and Sell Allstate Products

25.     In August 2011, years before forming Corinth and engaging in the scheme described herein, Mr. Burchard became an Allstate EA in Texas and executed the "Allstate R3001S Exclusive Agency Agreement" ("EA Agreement").  A true and accurate copy of Mr. Burchard's EA Agreement is attached hereto as Exhibit A.

26.     In addition to Mr. Burchard, after being recruited by Corinth and proceeding through Allstate's rigorous screening process, the following individuals became Exclusive Agents (together with Mr. Burchard, the "Corinth Controlled EAs") as of the dates identified, all of which fall within a short six (6) month window:

- Lorene Rumbaugh, July 1, 2018
- Russell Blanchard, August 1, 2018
- Scott Brieger, August 1, 2018
- Gregory Smith, September 1, 2018
- Desiree Vasquez, October 1, 2018
- Robert Kent, October 1, 2018
- Todd Wellman, November 1, 2018
- John (Jay) Harrell, November 1, 2018
- Alan Purnell, December 1, 2018

27.    In the regular course of its business, Allstate maintains EA Agreements in its files and regularly relies on those agreements.

28.    The Corinth Controlled EAs each signed the EA Agreement, effective as of the dates identified above.  True and accurate copies of the Corinth Controlled EAs' EA Agreements are attached hereto as Exhibits B through J.  The EA Agreements allowed each of the Corinth Controlled EAs to sell, and receive monies from the sale of, Allstate products.

29.    Pursuant to their EA Agreements, the Corinth Controlled EAs acknowledged that the following information is Allstate "confidential information" and property:

> [B]usiness plans of [Allstate]; *information regarding the names, addresses, and ages of policyholders of [Allstate]*; types of policies; amounts of insurance; premium amounts; the renewal dates of policies; policyholder listings and any policyholder information subject to any privacy law; claim information; certain information and material identified by [Allstate] as confidential or information considered a trade secret as provided herein or by law; and any information concerning any matters affecting or relating to the pursuits of [Allstate] that is not otherwise lawfully available to the public.

(EA Agreements, ¶ IV(D)) (emphasis added).

30.    Accordingly, the information regarding the names, addresses, and ages of Allstate customers (i.e. customer contact information) is considered Allstate confidential information and property, and is hereafter referred to as "confidential Allstate customer information."

8

31.     The Corinth Controlled EAs promised to not use Allstate confidential information and property, including confidential Allstate customer information, for any improper purpose either before or after their relationships with Allstate ended.  (*Id.*)

32.     The Corinth Controlled EAs also promised under their EA Agreements to maintain the confidentiality of Allstate confidential information, not to share Allstate confidential information with any unauthorized third party, and to return all Allstate confidential information and property to Allstate when their relationship with Allstate terminated.  (EA Agreements, ¶¶ IV(A)-(E), XVIII(B)).

33.     This promise includes not to disclose Allstate confidential information to any LSPs or other persons providing services to a Corinth EA unless that LSP or other person first signs Allstate's Confidentiality and Non-Competition Agreement.  (*Id.*, ¶ IV(C))  Put differently, the Corinth Controlled EAs were not to provide anyone, or any entity, access to Allstate confidential information, including confidential Allstate customer information, unless the Corinth Controlled EAs notified Allstate of the person or entity, Allstate approved the person or entity's access to Allstate confidential information, and the person or entity executed a Confidentiality and Non-Competition Agreement that protected Allstate confidential information.

34.     Corinth was aware of the above requirements but never informed Allstate that it planned to access, possess, and/or use Allstate confidential information.

35.     Nor did Corinth ever seek approval from Allstate to access, possess and/or use Allstate confidential information.

36.     Not surprisingly then, Allstate never approved Corinth to access, possess, and/or use Allstate confidential information.

37.    The Corinth Controlled EAs promised that they would remain actively involved in the conduct of business at their sales locations as well:

> The Company recognizes that you may, in your sole discretion, arrange to have business conducted at your sales location in your absence by your own employees or other persons and that the time during which you are physically present at your sales location is entirely in your sole discretion.  You must, however, remain actively involved in the conduct of business at your sales location.

(EA Agreements, Section II(E)).

38.    The Corinth Controlled EAs also agreed not to establish any additional sales locations without prior written approval by Allstate:

> You may select your sales location, within a geographical area specified by the Company, subject to Company approval. Initially, you have selected the location at and such sales location has been approved by the Company.  You agree that you will not establish any additional sales location without the prior written approval of the Company.

(EA Agreements, Section V(A)).

39.    Similarly, the Corinth Controlled EAs promised not to transfer any interest in, or cede any control over, their Exclusive Allstate Agencies without prior written approval by Allstate:

> This Agreement is personal to you and is being entered into in reliance upon and in consideration of your skills, qualifications, and representations.  Accordingly, you may not execute a transfer of your interest in this Agreement or any interest in the business under this Agreement including, but not limited to, any sale, assignment, conveyance or the granting of any lien, security interest, pledge, or mortgage thereof, without the prior written approval of the Company.  A transfer of interest in this Agreement is described in the Supplement and EA Manual and includes, but is not limited to, any sale, merger, or assignment, in whole or in part, directly, indirectly, or contingently, of this Agreement or any rights or obligations under it.  You have the obligation to notify the Company of a proposed transfer and to request Company approval.

(EA Agreements, Section XVI(A)).

40.    Corinth was aware of the above restrictions and, based upon information and belief, instructed the Corinth Controlled EAs to not comply with these restrictions.

41.     Based upon information and belief, Corinth also instructed the Corinth Controlled EAs to not inform Allstate that they were not in compliance with these instructions.

42.     Similarly and based upon information and belief, Corinth knew that Allstate would not approve of Corinth having control over the Corinth Controlled EAs and, consequently, never disclosed to Allstate that Corinth had control over the Corinth Controlled EAs.

43.     In addition to the EA Agreements, the Corinth Controlled EAs were also required to comply with Allstate's EA Manual, which contains policies governing the conduct of EAs, including the following:

- Agency Staff, Agent Responsibilities:  You are the person ultimately responsible for all sales and service activities of your LSP since he is acting under your direction or control.  His representations will be attributed to you.  It is your responsibility to be certain that your LSP is fully trained and prepared to represent Allstate well as a professional with the highest integrity.

- Conflict of Interest:  Sometimes people get themselves into situations that make it difficult for them to distinguish to whom they should be loyal.  These situations constitute conflicts of interest.  Allstate's position is that you, as a Company representative, should not take part in any activities that might prove to place you or your agency in a conflict of interest with respect to the duties you owe to Allstate.

- Other Business Interests:  Although as an independent contractor you can conduct other businesses, you may not have other duties or interests that would conflict with your duties under your R3001 Agreement.

- Integrity:  As a Company representative, you are expected to act honestly and fairly in all of the Company's business relationships.  You are expected to comply with Company policies and procedures, including the Allstate Agency Standards, and all applicable laws and regulations relating to the conduct of business under the R3001 Agreement.  Second, you may never falsify any state insurance department or Company documents, including applications, and you may never forge signatures.  Last, misappropriation of funds and cooperating with others to defraud, or any other illegal or criminal acts, will not be tolerated.

44.     Corinth was aware of these obligations as well and, based upon information and belief, instructed the Corinth Controlled EAs to not comply with these obligations and to hide their non-compliance from Allstate.

45.     Based upon information and belief, Corinth also instructed the Corinth Controlled EAs to not inform Allstate that they were not in compliance with these obligations.

46.     And certain of the Corinth Controlled EAs who were registered to sell securities, including Burchard, Blanchard, Brieger, and Smith, were required to comply with the Allstate Financial Services, LLC Policies and Procedures Manual, which contained the following "Outside Business Activities" policy, in relevant part:

> FINRA Rule 3270 states: "No registered person may be an employee, independent contractor, sole proprietor, officer, director or partner of another person, or be compensated, or have the reasonable expectation of compensation, from any other person as a result of any business activity outside the scope of the relationship with his or her member firm, unless he or she has provided prior written notice to the member, in such form as specified by the member."
>
> Passive investments and activities, which are those from which you might receive income, but for which you perform no services, are no longer "passive" if the registered person provides or engages in any service(s) that is essential or material to the continued operation of the OBA.
>
> Any PFR engaged in an activity that meets the criteria outlined above, should ensure that the activity has been reported in accordance with AFS policy. PFRs must submit an OBA Questionnaire via the AFS Registration/Trax website and receive written approval from their RFSL prior to engaging in the activity.
>
> . . . .

47.     Corinth was aware of these obligations as well and, based upon information and belief instructed the Corinth Controlled EAs to not comply with these obligations.

48.     Based upon information and belief, Corinth also instructed the Corinth Controlled EAs to not inform Allstate that they were not in compliance with these obligations.

**Corinth Induces the Corinth Controlled EAs to Breach their EA Agreements**

49.     Established in April 2017, Allstate's Enhanced Compensation Program ("ECP") is designed to assist start up agencies by providing a higher level of commission percentage payouts (as compared to established agencies) during the period the agencies were participating in the program.

50.      The participation period is dependent on the market conditions, but typically lasts from 36 to 48 months.

51.     The highest tier of commission percentage payout under the ECP occurs during the first six months of the program, then gradually diminishes until the end of the EAs participation in the program.

52.     Upon information and belief, Corinth was formed with the purpose of establishing and controlling EAs located in Texas in order to take advantage of ECP.

53.     To that end, Corinth recruited individuals who had no prior insurance experience, to become EAs, and then had the EA misrepresent itself to Allstate.

54.     For example, every EA is required to provide proof to Allstate that it has sufficient liquid capital ("capital requirement") to pay startup expenses, hire and pay agency staff, cover agency operating expenses, and to purchase leads and other advertising.  The capital requirement is $100,000 for becoming an EA.

55.     In several instances, Corinth provided the $100,000 initial capital requirement to the Corinth Controlled EA but neither the Corinth Controlled EA, nor Corinth, disclosed that Corinth was behind the capital requirement.

56.     Failure of the Corinth Controlled EA to disclose Corinth as the source of the capital requirement violated Allstate policies and guidelines.

13

57.     Corinth knew that the failure of the Corinth Controlled EA to disclose Corinth as the source of the capital requirement violated Allstate policies and guidelines.

58.     Corinth also knew that Allstate would not approve the Corinth Controlled EA if Allstate knew that Corinth was providing the capital requirement.

59.     Thus, and based upon information and belief, Corinth instructed the Corinth Controlled EA to lie to Allstate about the source behind the capital requirement.

60.     Once the individual became an EA, Corinth would then have the Corinth Controlled EA execute an operating agreement in which the Corinth Controlled EA would become a Corinth employee.  Corinth would also take control of the agency by purchasing equipment for the agency, seizing EA bank accounts and controlling payments out of the accounts, paying the EAs a salary (usually between $75,000 and $150,000 per year), and signing the lease for the agency location.

61.     Corinth knew that these activities violated the EA Agreement and Allstate policies, and that Allstate would not approve of it.

62.     Therefore and upon information and belief, Corinth instructed the Corinth Controlled EAs to hide this activity from Allstate.

63.     The Corinth Controlled EAs would also pay a "start-up" or "engagement" fee to Corinth (up to $200,000) and, more importantly, would cede all LSP control to Corinth. Consequently, Corinth would hire, fire, manage, and pay the LPSs working for the Corinth Controlled EAs.  Corinth would also assign sales goals to the LSPs and move the LSPs from one EA to another EA in order to manipulate the ECP.

64.     Corinth knew that these activities violated the EA Agreement and Allstate policies, and that Allstate would not approve of it.

65.     Therefore and upon information and belief, Corinth instructed the Corinth Controlled EAs to hide this activity from Allstate.

66.     Corinth was able to maintain control over the LSPs, in part, because most of the LSPs worked out of Corinth's business location known as the "Corinth Hub" instead of the Corinth Controlled EAs's agency location.

67.     LSPs staffed at the Corinth Hub were provided with access to and use of confidential Allstate customer information, which is a violation of Allstate agreements and policies because the Corinth Hub is not an authorized Allstate location and the Corinth Controlled EAs were never authorized to disclose confidential Allstate customer information to Corinth.

68.     Corinth induced the Corinth Controlled EAs to breach their EA Agreements in the following manner, possibly among others:

      a.     Corinth facilitated and encouraged the Corinth Controlled EAs to disclose confidential Allstate customer information relating to ECP and Allstate customers in violation of Sections IV(B) and IV(D) of their EA Agreements.

      b.     Corinth facilitated and encouraged the Corinth Controlled EAs to cede daily control of their agencies to Corinth in violation of Section II(E) of their EA Agreements.

      c.     Corinth established unauthorized sales locations for the Corinth Controlled EAs in violation of Section V(A) of their EA Agreements.

      d.     Corinth facilitated and encouraged the Corinth Controlled EAs to directly and/or indirectly transfer rights and obligations under their EA Agreements to it, including sales obligations and the right to earn commissions on policies written, in violation of Sections I(G) and XVI(A) of the EA Agreements.

      e.     Corinth facilitated and encouraged the Corinth Controlled EAs to cede sales functions to LSPs employed by Corinth that were not managed or controlled by the agents with which they were affiliated, in violation of Allstate's Agency Staff, Agent Responsibilities.

69.     In addition, Corinth induced the Corinth Controlled EAs to breach various policies contained in Allstate's Exclusive Agent Manual by participating in a business that manipulated the ECP, inadequately supervised LSPs, and exposed confidential Allstate customer information to individuals and entities who were not entitled to review, much less possess, confidential Allstate customer information.

70.     And Corinth induced Burchard, Blanchard, Brieger, and Smith to breach the Allstate Financial Services, LLC Policies and Procedures Manual by failing to disclose their financial involvement in and compensation from Corinth.

71.     As a result of the foregoing, Allstate terminated the Corinth Controlled EAs on May 28, 2019.  However, because the majority of the Corinth Controlled EAs' LSPs were working out of the Corinth Hub, confidential Allstate customer information remains in Corinth's possession, custody and control, and Corinth has not returned it.

72.     Indeed, Allstate's concerns about Corinth possessing and controlling confidential Allstate customer information was confirmed when one Corinth EA informed Allstate during the termination of his Agency that "his [customer] files" were at Corinth.

**Irreparable Harm to Allstate**

73.     Corinth is harming Allstate's legitimate business interests by illegally misappropriating and possessing confidential Allstate customer information which, as described below is a trade secret.

74.     Moreover, Allstate's trade secrets, confidential information and goodwill are at risk because, upon information and belief, Corinth is actively using confidential Allstate customer information.

75.     By refusing to return confidential Allstate customer information and property, Corinth is harming Allstate's legitimate business interests.

76.     Furthermore, Allstate relies on its confidential Allstate customer information to service its clients' needs, make sure its clients are satisfied with their respective Allstate products, and sell additional products and services to its clients.

77.     If a competitor obtained confidential Allstate customer information, the competitor would be able to unfairly compete with Allstate.  For example, a competitor could use confidential Allstate customer information to contact Allstate customers and offer those customers competing products and services based upon terms and conditions that undercut Allstate.

78.     Injury to Allstate is therefore both probable and imminent because Corinth clearly intends to continue using confidential Allstate customer information to compete with Allstate.

79.     Finally, Corinth's conduct poses probable and imminent harm to Allstate customers.  By continuing to possess and use confidential Allstate customer information, Corinth could potentially illegally access private customer information.

80.     Accordingly, Allstate is suffering irreparable harm and injunctive relief is necessary and appropriate to prevent further damage to Allstate.

## COUNT I
### (Violation of the Defend Trade Secrets Act)

81.     Allstate repeats and realleges the foregoing paragraphs of the Complaint as if fully set forth herein.

82.     As a result of its improper relationships with the Corinth Controlled EAs, Corinth was provided access to substantial amounts of confidential Allstate customer information.

83.     Confidential Allstate customer information is not available to the general public and is closely guarded by Allstate. Allstate keeps such information strictly confidential in order to maintain a competitive advantage over competitors.

84.     Confidential Allstate customer information is considered a trade secret under the Defend Trade Secrets Act, 18 U.S.C. § 1833, et seq. ("DTSA"), because the information is not generally known outside of Allstate's business, the information is not generally known by employees and others involved in Allstate's business, Allstate has taken reasonable measures to guard the secrecy of the information, the information is of great value to Allstate and its competitors, Allstate invested significant amounts of time and money in developing the information, the information cannot easily be acquired or duplicated by others, and Allstate continuously uses the information in its business.

85.     The Corinth Controlled EAs were under a contractual obligation to use confidential Allstate customer information only on behalf of Allstate and to not disclose confidential Allstate customer information to anyone not authorized to receive or review the information (i.e. Corinth).

86.     The Corinth Controlled EAs were also required to return confidential Allstate customer information to Allstate immediately upon termination of their EA Agreements.

87.     The Corinth Controlled EAs, however, passed confidential Allstate customer information along to Corinth, which, again, is not authorized to receive, possess, or access *any* Allstate confidential information.

88.     Corinth knew that it was not entitled to use, access or possess confidential Allstate customer information.

89.     Furthermore and as of May 28, 2019, when Allstate terminated its relationship with the Corinth Controlled EAs, the LSPs operating out of the Corinth Hub are no longer authorized to write Allstate policies.  As such, Corinth has no right, legal or otherwise (to the

extent it ever did), to retain any Allstate confidential information, including confidential Allstate customer information.

90.     Upon information and belief, Corinth continues to possess confidential Allstate customer information.

91.     Unless restrained, Corinth will use, divulge, disclose, acquire and/or otherwise misappropriate confidential Allstate customer information.

92.     Furthermore, actual or threatened misappropriation of confidential information may be enjoined under the DTSA.

93.     It is axiomatic that if Corinth is actively using confidential Allstate customer information, then Corinth has no intention of complying with the DTSA.

94.     Consequently, Corinth's actions constitute the actual and/or threatened misuse of Allstate confidential information.  Injunctive relief against Corinth is therefore appropriate.

95.     Naturally then, Allstate requests an order enjoining Corinth from possessing, accessing, or using confidential Allstate customer information, and any other Allstate confidential information in its possession or control, and from disclosing Allstate confidential information to anyone not authorized to receive the confidential information.

96.     Allstate further requests an order requiring Corinth to return any and all confidential Allstate customer information, and any other Allstate confidential information in its possession or control, to Allstate.

97.     Finally, Corinth's misappropriation of confidential Allstate customer information has been willful and malicious, and Allstate has incurred significant damages as a result of Corinth's misappropriation.

98.     Corinth's actions have also damaged Allstate's goodwill, reputation, and legitimate business interests.

99.     Allstate is therefore entitled to recover not only compensatory damages, including, without limitation, the amount of commissions and other revenues Corinth obtained as a result of its scheme to manipulate Allstate's ECP and misappropriate confidential Allstate customer information, but also punitive damages and attorneys' fees resulting from Corinth's wrongful misappropriation of confidential Allstate customer information.

<u>**COUNT II**</u>
**(Violation of the Texas Uniform Trade Secrets Act)**

100.     Allstate repeats and realleges the foregoing paragraphs of the Complaint as if fully set forth herein.

101.     As a result of its improper relationships with the Corinth Controlled EAs, Corinth was provided access to substantial amounts of confidential Allstate customer information.

102.     Allstate derives independent economic value from its confidential Allstate customer information; such information is not generally known or readily ascertainable by proper means by other persons who can obtain economic value from its disclosure and use; and the information is the subject of significant efforts to maintain its secrecy.

103.     As such, confidential Allstate customer information is considered a "trade secret" under the Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code Ann. §§ 134A.001, *et seq.*

104.     Corinth knew or should have known that confidential Allstate customer information, as described, (1) is confidential; (2) was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; (3) was developed or acquired by Allstate at great expense and effort; (4) was maintained as confidential and is not generally available to the public

and Allstate's competitors; (5) would provide significant benefit to a competitor seeking to compete with Allstate; and (6) is critical to Allstate's ability to conduct its business successfully.

105.    Corinth also knew that it should not possess, or have access to, any Allstate confidential information, including confidential Allstate customer information.

106.    As such, Corinth has misappropriated confidential Allstate customer information without Allstate's consent and in violation of the Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code Ann. §§ 134A.001, *et seq.*

107.    Corinth will be or is being unjustly enriched by the misappropriation and/or threatened misappropriation of confidential Allstate customer information, and, unless restrained, will continue to threaten to use, divulge, and/or otherwise misappropriate confidential Allstate customer information.

108.    Allstate therefore requests an order enjoining Corinth from using confidential Allstate customer information and/or any Allstate confidential information, and from disclosing confidential Allstate customer information and/or any Allstate confidential information to anyone not authorized to receive such information.

109.    Allstate also requests an order requiring Corinth to return to Allstate confidential Allstate customer information, as well as any and all Allstate confidential information, in its possession, custody, or control.

110.    Allstate has incurred significant damages as a result of its misappropriation of confidential Allstate customer information.

111.    Upon information and belief, Corinth's misappropriation has been willful and malicious.

112.     As a direct and proximate result of Corinth's misappropriation of confidential Allstate customer information, Allstate faces the imminent threat of irreparable harm, and has suffered and will continue to suffer monetary damages.

113.     Allstate is entitled to injunctive relief to prevent the threatened, imminent, and ongoing harm caused by Corinth's misappropriation of confidential Allstate customer information, as well as monetary damages in an amount to be determined at trial.

114.     Allstate is therefore entitled to recover not only compensatory damages, including, without limitation, the amount of commissions and other revenues Corinth obtained as a result of its scheme to manipulate Allstate's ECP and misappropriate confidential Allstate customer information, but also punitive damages and attorneys' fees resulting from Corinth's wrongful misappropriation of confidential Allstate customer information.

<u>**COUNT III**</u>
**(Tortious Interference with Contract)**

115.     Allstate repeats and realleges the foregoing paragraphs of the Complaint as if fully set forth herein.

116.     Allstate has valid and enforceable contractual relationships with the Corinth Controlled EAs by virtue of the EA Agreements.

117.     Allstate had a reasonable expectation that the Corinth Controlled EAs would comply with the provisions of the EA Agreements.

118.     Corinth had knowledge of the EA Agreements with the Corinth Controlled EAs.

119.     By the acts described above, Corinth has intentionally interfered with Allstate's contractual relationships with the Corinth Controlled EAs and Allstate customers.

120.     By the acts described above, Corinth had an improper motive and used improper means in interfering with Allstate's contractual relations without lawful justification.

121.     As a direct and proximate result of Corinth's actions described above, Allstate has suffered and continues to suffer irreparable harm and monetary damages.

122.     By reason of the foregoing, Allstate requires injunctive relief.  Unless injunctive relief is granted, Allstate will be irreparably harmed in a manner not fully compensable by money damages.  In addition, Allstate has been damaged in an amount to be determined at trial, including, without limitation, the amount of commissions it obtained as a result of its scheme to manipulate Allstate's ECP and interfere with the EA Agreements.

<u>**COUNT IV**</u>
**(Unjust Enrichment)**

123.     Allstate repeats and realleges the foregoing paragraphs of the Complaint as if fully set forth herein.

124.     Corinth obtained Allstate confidential, proprietary, and trade secret information, that in equity and good conscience it should not have obtained.

125.     Corinth knew of the benefit it retained by misappropriating this information and by acquiring the information by improper means.

126.     Corinth also has been unjustly enriched in the amount of commissions and other revenues it obtained as a result of its scheme to manipulate Allstate's ECP.

127.     As a direct and proximate result of Corinth's actions described above, Allstate has suffered and continues to suffer irreparable harm and monetary damages.

128.     By reason of the foregoing, Allstate requires injunctive relief.  Unless injunctive relief is granted, Allstate will be irreparably harmed in a manner not fully compensable by money damages.  In addition, Allstate has been damaged in an amount to be determined at trial.

## COUNT V
**(Replevin)**

129.     Allstate repeats and realleges the foregoing paragraphs of the Complaint as if fully set forth herein.

130.     Allstate is the sole owner of any and all confidential Allstate customer information that has been or currently is possessed by Corinth.

131.     As a result of its improper relationships with the Corinth Controlled EAs, Corinth was provided access to substantial amounts of confidential Allstate customer information.

132.     The Corinth Controlled EAs were under a contractual obligation to use confidential Allstate customer information only on behalf of Allstate and to not disclose any Allstate confidential information, including confidential Allstate customer information, to anyone not authorized to receive or review the confidential information (*i.e.*, Corinth).

133.     The Corinth Controlled EAs were also required to return all Allstate confidential information, including confidential Allstate customer information, to Allstate immediately upon termination of their EA Agreements.

134.     The Corinth Controlled EAs, however, passed confidential Allstate customer information along to Corinth, which, again, is not authorized to receive, possess, or access any Allstate confidential information.

135.     As of May 28, 2019, when Allstate terminated its relationship with the Corinth Controlled EAs, the LSPs operating out of the Corinth Hub are no longer authorized to write Allstate products.  As such, Corinth has no right, legal or otherwise (to the extent it ever did), to retain confidential Allstate customer information and/or any Allstate confidential information.

136.     Upon information and belief, Corinth continues to possess and unlawfully retain confidential Allstate customer information.

137.    No lawful purpose exists for Corinth to possess confidential Allstate customer information.

138.    Corinth's unlawful retention and use of confidential Allstate customer information has caused Allstate to incur significant damages.

139.    Corinth's actions have also damaged Allstate's goodwill, reputation, and legitimate business interests.

140.    Allstate requests an order requiring Corinth to return any and all Allstate confidential information to Allstate.

141.    In addition to the return of all confidential Allstate customer information, Allstate is also entitled to recover not only compensatory damages, but also punitive damages.

**PRAYERS FOR RELIEF**

**WHEREFORE**, Plaintiff Allstate Insurance Company respectfully requests that this Court:

1.    Enter an injunction enjoining and restraining Corinth and its agents, representatives, servants, employees, and all those acting in concert or participation with it, from using, possessing, disclosing, or having access to any Allstate confidential information, including confidential Allstate customer information;

2.    Enter an order requiring Corinth to return all confidential Allstate customer information and any other Allstate confidential information in its possession, custody or control to Allstate;

3.    Enter judgment against Corinth for compensatory damages in an amount to be determined at trial, including, without limitation, the amount of commissions Corinth obtained as a result of its scheme to manipulate Allstate's ECP and misappropriate confidential Allstate customer information;

4.      Enter judgment against Corinth for exemplary damages in an amount to be determined at trial;

5.      Award Allstate the costs and expenses, including the reasonable attorneys' fees, Allstate incurs as a result of Corinth's misappropriation of Allstate trade secrets pursuant to Texas law and the Defendant Trade Secrets Act, and its tortious interference with Allstate's contracts; and

6.      Award Allstate such other relief as the Court may deem just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

ALLSTATE INSURANCE COMPANY,

By its attorneys,

/s/ John P. Phillips
John P. Phillips
Texas Bar No. 24083659
Federal I.D. No. 1691762
SEYFARTH SHAW LLP
700 Milam Street, Suite 1400
Houston, TX 77002
Tel: (713) 225-2300
Fax: (713) 225-2340
E-Mail:  jphillips@seyfarth.com

J. Scott Humphrey (to be admitted *pro hac vice*)
Katelyn R. Miller (to be admitted *pro hac vice*)
SEYFARTH SHAW LLP
233 South Wacker Drive, Suite 8000
Chicago, IL 60606-6448
Tel: (312) 460-5000
Fax:  (312) 460-7000
E-Mail:  shumphrey@seyfarth.com
          kmiller@seyfarth.com

Erik W. Weibust (to be admitted *pro hac vice*)
SEYFARTH SHAW LLP
Two Seaport Lane, Suite 300
Boston, Massachusetts  02210
Tel: (617) 946-4800
Fax: (617) 946-4801
E-Mail: eweibust@seyfarth.com

COUNSEL FOR PLAINTIFF, ALLSTATE INSURANCE
COMPANY

Dated:  June 3, 2019

27

## **VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I, Lawrence Sedillo, Field Senior Vice President for the Texas Region of Allstate Insurance Company, on behalf of Allstate Insurance Company, declare under penalty of perjury that the statements set forth in the foregoing Verified Complaint for Injunctive and Other Relief are true and correct except as where such statements are made upon information and belief.

Dated:  June 3, 2019

_____/s/ Larry Sedillo_____
Larry Sedillo